2022 IL App (1st) 200911
No. 1-20-0911
Opinion filed December 9, 2022

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09 CR 02019 |
| DELONDRE TOWNSEND, | ) ) | The Honorable Brian Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice Walker concurred in the judgment and opinion.
Justice Tailor concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1      Defendant Delondre Townsend was convicted after a jury trial of first degree murder, for the shooting death of Brandon Riley on December 29, 2008. The victim was driving a van at 1 a.m. when his driver's-side rear window was shot out, and the victim sustained a gunshot head wound from which he later died. Shortly after the offense, the 18-year-old defendant confessed to the shooting, and two eyewitnesses identified defendant as the shooter. However, 10 years later, at the 2019 trial, defendant denied being the shooter, and the two eyewitnesses recanted. No physical evidence connected defendant to the shooting, and he was not arrested

at the scene of the offense. After considering factors in aggravation and mitigation, the trial court sentenced defendant to 45 years with the Illinois Department of Corrections (IDOC).

¶ 2    On this appeal, defendant claims, first, that the trial court erred by not suppressing his inculpatory statements made at the station house on January 1, 2009, because his detention at the police station was a *de facto* arrest and the police lacked probable cause at that time to arrest him. (The station house questioning that occurred the day before, on New Year's Eve, is not at issue on this appeal.) Second, defendant claims that we should either reduce his 45-year sentence to the 35-year statutory minimum or vacate it and remand the case for resentencing, because the trial court gave him a higher sentence based on the victim's death, which is a factor already inherent in the offense. As part of his second claim, defendant asks this court to exercise the discretion granted to us under Illinois Supreme Court Rule 615(b) to reduce his sentence to the statutory minimum of 35 years.

¶ 3    In response to the first claim, the State argues that defendant's station house interview on New Year's Day was a voluntary and consensual encounter rather than an arrest. The State acknowledges in its brief to this court that it lacked probable cause to arrest defendant until he confessed.[1] Since the State does not argue that this was a brief investigative detention or that it had probable cause prior to the moment of confession, we must determine whether the questioning at the police station was a voluntary and consensual encounter; otherwise, the police lacked probable cause for an arrest, and the resulting confession should have been suppressed.

---

[1]The State asserts that "it was at that time [of the confession] the police developed probable cause and arrested defendant."

¶ 4    If we find that the confession should have been suppressed, the State argues, in the alternative, that any error in not suppressing it was harmless because the jury would not have acquitted defendant after hearing the two eyewitnesses' pretrial statements, even though they both recanted. The State makes no argument that defendant forfeited this claim for our review, so the harmless error standard applies.

¶ 5    In response to the second claim, the State argues that defendant forfeited his sentencing claim by failing to object both at sentencing and in a postsentencing motion. Defendant acknowledges in his brief to this court that his sentencing claim is forfeited. However, defendant argues that his sentencing claim rises to the level of plain error because the evidence at his sentencing was closely balanced. Defendant observes that he was only three months past his eighteenth birthday at the time of the offense, he had only one misdemeanor battery conviction, and he was a high school senior with a 3.2 grade point average at the time of his arrest. Defendant also argues that the trial court's reliance on a factor inherent in the offense was a fundamental error that denied him a fair sentencing hearing. Defendant asks this court to exercise the discretion granted to it by Illinois Supreme Court Rule 615(b)(4) to reduce his sentence to the 35-year statutory minimum. This court permitted supplemental briefing by the parties on the Rule 615(b) issue.

¶ 6    With respect to defendant's first claim, we find that the trial court did not err in denying defendant's pretrial motion to suppress. Since this is his sole claim regarding his conviction and the evidence supporting it, we affirm his conviction. With respect to his second claim, we find that the trial court committed the plain sentencing error that defendant alleges. We are persuaded that this is the rare case that merits the exercise of our discretion under Rule 615(b)(4), and we reduce defendant's sentence to the statutory minimum of 35 years.

¶ 7                                     BACKGROUND

¶ 8                            I. Pretrial Motion to Suppress

¶ 9      Since defendant argues on appeal that the trial court erred in denying his pretrial motion, we provide the circumstances of this motion and the ensuing pretrial proceeding in detail below.

¶ 10                              A. Defendant's Motion

¶ 11     On December 19, 2012, defendant filed a motion to quash his arrest and suppress statements. The motion alleged that on January 1, 2009, at 10:30 a.m., he was taken into custody at his home by a member of the Cook County Sheriff's Police Department, without a warrant or probable cause to arrest. As we noted above, the State does not argue on appeal that the police had either a warrant or probable cause at this time.

¶ 12     The motion alleged that, initially, he was questioned at the Markham district station of the sheriff's police on December 31, 2008, by detectives and Assistant State's Attorney (ASA) Maureen Delahanty and released the same day. The motion moved to suppress the statements made on January 1, 2009, but not the statements made on December 31, 2008.

¶ 13     Defendant filed a second motion to suppress, on July 10, 2015, which was later amended on August 17, 2015, and again amended on September 16, 2015. This second suppression motion alleged that the statements made on both December 31 and January 1 were involuntary.[2] However, defendant's appellate brief states: "That second suppression motion is not at issue on this appeal." Thus, we do not consider it.

¶ 14                              B. Suppression Hearing

---

[2]At the hearing on this motion, the evidence established that defendant appeared to be having an asthma attack after giving his confession, and the police called paramedics. The trial court found that the statements were not involuntary, and defendant does not appeal this finding.

¶ 15     On September 22, 2014, the defense called in support of the first motion (1) Officer Frank D'Oronzo, with the Cook County sheriff's police; (2) Lashanna Fulwiley, defendant's sister; and (3) defendant. We provide the details of both direct and cross-examination as necessary to examine the issues of credibility in dispute.

¶ 16                                1. Officer D'Oronzo

¶ 17                                a. Direct Examination

¶ 18     D'Oronzo testified that he had been a police officer with the Cook County sheriff's police for 21 years. While investigating this offense, he learned that people of interest included men nicknamed Pumkin, E.J., and Boo-man. D'Oronzo was "informed who they were by our gang guys." Detective Rafferty visited the home of defendant, also known as Pumkin, but defendant was not at home. On December 31, 2008, the police received a call from defendant's mom indicating defendant was now at home, and D'Oronzo went there with Detective Ortiz[3] and gang officer Terry Tabb to bring defendant to the police station located in the Markham Courthouse. D'Oronzo and Ortiz's interview of defendant was not videotaped because, at that time, the police "believed him to be a witness." Defendant provided "a written statement as a witness," with ASA Maureen Delahanty present. After the statement was typed and defendant signed it, he was released. The police then picked up the person who defendant alleged was the offender.

¶ 19     D'Oronzo testified that, on January 1, 2009, Detective Stephen Moody, dressed in "a shirt and tie," went to defendant's home to pick up defendant again. Defendant traveled in the detective's car, which was a plain car. D'Oronzo did not go. Although defendant arrived at the station sometime in the morning or midday, D'Oronzo did not speak to defendant until

---

[3]No first name was provided for Ortiz at the pretrial suppression hearing.

sometime in the early afternoon. While defendant was waiting at the station, he was free to go if he had asked, as he was not handcuffed. Defendant waited in the lobby or roll-call room, which D'Oronzo described as "a big room" with two doors. One of the reasons for bringing defendant back to the station was for a possible lineup.

¶ 20      D'Oronzo interviewed defendant on January 1 in order "to clarify some information." When the police interviewed the suspect whom defendant had identified as the shooter, the suspect adamantly denied that he was the shooter and adamantly denied that he went by the street name provided by defendant. D'Oronzo's interview with defendant on January 1 was videotaped.

¶ 21                          b. Cross-Examination

¶ 22      On cross-examination, D'Oronzo testified that, although the shooting occurred on December 29, the victim did not die until December 31, thereby turning the investigation into a homicide investigation at that time. D'Oronzo did not learn that the victim had died until after speaking with defendant on December 31. When defendant's mother called the police, she indicated that defendant needed a ride to the station. When D'Oronzo, Ortiz, and Tabb arrived at defendant's home on December 31, D'Oronzo and Ortiz both wore a shirt and tie with their badges and firearms, while Tabb was dressed in jeans, a T-shirt, and a black tactical vest with "Police" written on it. After they knocked on the door or rang the bell, defendant came outside to speak to them. D'Oronzo asked defendant to come with them, and he agreed. The officers did not handcuff defendant, and they did not draw their guns. There were no other police vehicles present, except for the one unmarked car that they had arrived in. After being patted down, defendant was placed in the back seat, without handcuffs. Prior to the interview

on December 31, Ortiz advised defendant of his *Miranda* rights, and defendant agreed to speak with the police. See *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 23    D'Oronzo testified that, on December 31, defendant first told them that he was with his girlfriend the night of the shooting and that he did not learn of the shooting until the next day. Defendant said that it was not until the next day that he also learned that his name was being discussed in connection with the shooting. Defendant stated that he was going to turn himself in, but he did not want to deal with the police station on New Year's Eve. D'Oronzo indicated to defendant that he did not believe him, and an "interrogation" ensued. Although video equipment was available, the police were not legally required to videotape the interrogation at that point because it was not a homicide investigation, and they did not know that the victim was about to die. D'Oronzo offered defendant the opportunity to take a polygraph test, which was performed on December 31 but rendered "inconclusive" results. After the polygraph test, the officers interviewed defendant again and told him that the polygraph did not indicate that he was being truthful with them. At that point, defendant changed his story.

¶ 24    D'Oronzo testified that, during the second interview on December 31 after the polygraph test, defendant told the police that he was not with his girlfriend, that he received a call from "E.J." or Elijah White, and that, when the shooting occurred, defendant was with White but defendant was leaving in his mother's vehicle such that defendant did not witness White actually shooting. D'Oronzo told defendant that he did not believe him. However, at that point, the only information that D'Oronzo had regarding defendant being at the scene of the shooting was the information that defendant had just provided.

¶ 25    D'Oronzo testified that defendant changed his story a third time to state that he was present when White did the shooting and then defendant left the scene. D'Oronzo testified that

he believed defendant enough to have defendant's statement memorialized in writing by an ASA and that, based on his experience, D'Oronzo would not have called for an ASA to memorialize the statement if he thought defendant was still lying. At that time, D'Oronzo thought defendant was a witness, and he continued his investigation based on that information. D'Oronzo identified the typed statement that was taken by D'Oronzo and Ortiz in the presence of ASA Delahanty and that defendant signed. The last page, which was also signed by defendant, contains a photograph of the person whom defendant identified as the shooter. After the statement was taken, defendant was released and allowed to return home, because the police believed he was a witness. D'Oronzo testified that, if they had thought defendant was involved in the murder, they would not have released him. Moody drove defendant home. Later that night, the victim died.

¶ 26        D'Oronzo testified that the next step in the investigation was to interview the person whom he now believed was the shooter: Elijah White. After learning that the victim died, D'Oronzo asked Moody to pick up defendant again the next morning, January 1, in case they also needed him. When defendant arrived at the station, D'Oronzo was in another room where White was being interviewed by Rafferty. White's interview was videotaped because, at that point, it had become a homicide investigation. White was adamant that he had nothing to do with the shooting and that his nickname was not E.J. When White was offered the opportunity to take a polygraph test, White was "[a]damant about taking it." White stated that he was with his girlfriend that night.

¶ 27        D'Oronzo testified that it was unusual for a suspect to be so adamant about taking a polygraph test. Before the test was administered, D'Oronzo testified that he spoke to defendant again and defendant appeared scared. At this point, D'Oronzo did not know whether defendant

was hiding the identity of the real shooter. Defendant was with Moody in the roll-call room, and they were watching a Blackhawks game on television. Defendant was not handcuffed. When D'Oronzo approached, he told defendant that he had some things that he wanted to clarify with defendant. D'Oronzo and defendant went to an interview room with Rafferty, and the rest of their conversation was videotaped because it was now a homicide investigation.

¶ 28    D'Oronzo testified that, during that interview which began at 3:49 p.m., defendant eventually admitted to being the shooter. The officers were surprised when they realized they had a confession rather than some clarification.

¶ 29                                                    c. Redirect

¶ 30    On redirect examination, D'Oronzo confirmed that, on December 31, defendant was "a person of interest," based on a "source of information" who had provided the nicknames Pumkin, E.J., and Boo-Man. The "gang team" said that Pumkin was defendant and E.J. was Elijah White. The "source of information" said that Pumkin shot at the van. Based on that information, defendant was a suspect on December 31, when the officers read him his *Miranda* rights and questioned him. The possible results of the polygraph test were lying, not lying, and inconclusive. The result of defendant's polygraph test was inconclusive, rather than lying. Elijah White told officers on January 1 that he goes by E not E.J., and he offered no information about the shooting.

¶ 31                                         2. Defendant's Sister

¶ 32    Next, the defense called Lashanna Fulwiley, defendant's sister, as a witness. On January 1, 2009, Fulwiley was present at the house where defendant resided. Fulwiley did not live there but had arrived December 31 and had stayed overnight. Their mother, who lived there, was also present. On the morning of New Year's Day, Fulwiley heard a loud banging on

the door and opened the door to see two men in "regular" clothing. One of the men said that he was an investigator and wanted to speak with Pumkin. When Fulwiley looked at him, the man stated defendant's full name. Fulwiley told them to "hold on" and asked her little brother to see if defendant was in the back of the house, and her little brother returned and said that he was. Then she told "them" to tell defendant to come to the living room because people were here to see him. The police did not enter the home, and Fulwiley "never opened the door to let them in." Defendant came to the door and opened "the screen door." Fulwiley explained that it was a screen door at other times of the year but that it had "glass in it *** because it was wintertime at that time." The police said they needed to speak with him, so defendant stepped outside. They walked down the sidewalk from the house, and Fulwiley could see their lips moving but could not hear the words. The officers patted defendant down, handcuffed him, placed him in the back of their car, and left. Fulwiley did not see defendant again after he was placed in custody.

¶ 33     On cross-examination, Fulwiley testified that she was "uncertain" whether there were two men. As she watched the police and defendant walk away, one door was open, and she was looking through the glass of the "screen door." She stood in the same spot until the police left. Nothing obstructed her view.

¶ 34                                  3. Defendant

¶ 35                              a. Direct Examination

¶ 36     Defendant testified that on December 31, 2008, his mother informed him that the police had been to their home and were looking for him. She gave him the card that they had left with her, and he called them. They asked if they could talk to him, and he said, "sure, you can come to the house." The police arrived with five or six cars, but only two officers came to the house.

Between 10 and 12 officers were outside. Of the cars, "a couple" were marked squad cars, and "a couple" were regular cars. When they knocked on the door, defendant answered it, and they asked for him by name. After he identified himself, they asked him to come to the police station, and he complied. They did not offer him the opportunity to go to the station on his own. Instead, the officers walked him to a car and told him to place his hands on the car, and they searched him. After the search, they handcuffed his hands behind his back and placed him in the back of a squad car. They drove him to the police station in the Markham courthouse, took off the cuffs, and took him to an interview room. The door of the room was closed, and he was not free to leave. The officer gave him a form with *Miranda* rights and told him to sign it. Defendant did not understand what his rights were because he had never been in trouble before, but he signed it because the officer told him that "the quicker" they got this over with, "the quicker" he could leave.

¶ 37    Defendant testified that there were two officers in the interview room, and they asked him if he knew anything about the murder at a particular intersection on December 29. Defendant told them that he had heard E.J. was involved. The officers took the coat and hoodie defendant was wearing and said they were testing the clothes for gunshot residue. They put fluid on his hands and told him to place his hands on something. After defendant volunteered to take a polygraph test, they took him to a different room, where the door was also closed. There was never a point when he was alone without an officer or when he was free to leave.

¶ 38    Defendant testified that they typed out a statement for him to sign, which he did, and they returned his clothes to him. Defendant signed each page of the statement. However, he testified that it was not his signature that appeared on the final page with the photograph. Defendant was told that he could make a phone call, and he called his sister to come pick him

up, which she did, and they went home. The police did not escort him out; he exited on his own.

¶ 39        Defendant testified that on January 1, he was in the back room of his house, when his niece told him that his mother said to come because the police were at the door. When defendant entered the living room, two plain-clothed police officers were already in the living room, and they told him they needed him to come with them again for further questioning. The officers did not give him the option of driving himself to the station. After defendant walked outside with the officers, they "checked" him for weapons, told him to put his hand behind his back, handcuffed him, and drove him to the Markham police station. At the station, he was taken to a conference room with one closed door. Defendant was never left alone without an officer present, and he was not free to go. After some initial conversation, defendant was moved to the interview room where he had been the day before. In the interview room, he was read his rights. Three officers interviewed him, and they were not the same officers who had transported him to the police station.

¶ 40        Defendant testified that "the first thing" the officers said to him was that they knew he "had something to do with it." They never told him that he was there to view a lineup or a photo array or to provide information. On January 1, there were two or three interviews, and in between interviews, he was kept in the same room. He was in this room for a lengthy period of time, and he provided the names of other persons who may have been present at the offense scene.

¶ 41                                b. Cross-Examination

¶ 42        On cross-examination, defendant testified that there were 10 to 12 cars outside his home on December 31; some were marked, and some were unmarked. There were also 10 to

12 officers outside; some were in uniform, and some were not. None removed a gun from a holster. Defendant had the nickname "Pumpkin,"[4] but a lot of people in the neighborhood had the same nickname. On December 31, the police asked him if he knew someone named E.J.; defendant did not bring up E.J.; the police did. Defendant told them that he was at his girlfriend's house until the morning when he heard about the shooting.

¶ 43        Defendant testified that he was not anywhere near the murder scene at the time of the murder. Since he knew he was telling the truth, he volunteered to take a polygraph test. After the test, the police told him that the result was inconclusive and that he was probably not telling them the whole truth. Defendant testified that, after that point, "I didn't tell them nothing else." Defendant acknowledged that he signed a statement on December 31 at 7:55 p.m. After the polygraph test, the police called an ASA to come talk to him. However, after the polygraph test, he did not have any further conversation with the police about the shooting. The ASA arrived, and she "was on the computer," and "they put [defendant] back in the holding cell." When the ASA was finished, they brought defendant back to the small office where the ASA and an officer were, and the ASA showed defendant the statement. Before defendant signed the statement, the ASA asked him if this was "everything that [he] had told the officers," and he read it and said it was. The ASA also asked if he wanted to make any changes, and he did not. After defendant signed it, the ASA told him he could call home and have someone pick him up. Defendant confirmed that the last page contained a photo of White but denied that the signature on the photograph page was his. All the other signatures on the statement and the *Miranda* form were his.

---

[4]During opening statements, counsels spell the nickname as "pumkin" for the court; however after page 246 of the record, the spelling becomes "pumpkin."

¶ 44       On the morning of January 1, after his niece came to the back room of the house to tell him that his mother said there were "a whole lot of police out here," defendant came to the living room at the front of the house, looked out of the living room window and observed 10 or 12 police cars outside. Defendant's sister was sitting on the living room couch, and the front door was closed. Defendant sat on the couch, the police rang the doorbell, and his sister got up to answer it. Three plainclothes officers asked to speak to defendant, identifying defendant by his first and last name; they did not use the nickname "Pumpkin." Defendant rose and went to the door, and the police stated: "we need you to come back down to the station for further questioning." Defendant later learned that one of the officers was Detective Moody. Defendant replied: "Okay, I go with you." After defendant left the house with the officers, he walked toward the police car, and he was patted down, handcuffed, placed in the back seat and driven to the station.

¶ 45       Defendant testified that, at the station, he was taken to a conference room, with a big table and a television, where Moody introduced himself. Moody asked defendant questions such as what he did for a living, but Moody did not ask about the case because, as Moody explained, he was waiting for one of the detectives. Defendant's handcuffs were still on. Moody was watching hockey on television, but defendant was not paying attention because he does not follow hockey. They did not talk about the game, and Moody never left the room. At some point the detective who Moody was waiting for came in, and defendant was taken to the interview room, where he was the day before. They removed the handcuffs, and Moody, Ortiz and D'Oronzo were all there. They started off by saying that they knew defendant had something to do with it. Defendant had more than one conversation with the officers in that room that day. During these conversations, defendant admitted to being the shooter.

¶ 46                                              c. Redirect Examination

¶ 47            On redirect examination, defendant testified that, on both days, he did not believe that he could refuse to go with the police; on both days, he was handcuffed, placed in the back seat, and not given the option to go to the station on his own. While at the station, he was in rooms with closed doors, with officers present, and not free to leave. The handcuffs were not removed until he was placed in an interview room. Defendant was not asked to view a lineup or photo array. Defendant did not tell the officers on December 31 that E.J. was Elijah White, and he was not shown the photograph on December 31 that was attached to his statement.

¶ 48                                              4. The State's Case

¶ 49            At the close of defendant's evidence, the State moved for a directed finding that the encounter was voluntary and, thus, the burden had not shifted to the State to show probable cause. While listening to the parties' arguments on the motion, the trial judge informed them that defendant's release from the station "would lead me to believe that he's not a suspect." The judge explained: "I've been doing this long enough to know that the police keep him there for days at a time if they believe somebody is a suspect. So, I will let you know that, that weighs heavily on me." The proceedings adjourned to permit the trial court to read the transcripts. On January 8, 2015, despite the trial judge's earlier statements, the trial court denied the State's motion for a directed finding and found that the burden had, indeed, shifted to the State.

¶ 50            On March 18, 2015, the hearing resumed with the State's case. The State called Officer Moody, who testified that, in the evening of December 31, 2009, D'Oronzo and Rafferty asked Moody to drive a witness back home. Moody went with Detective Bernson to a conference room and said to defendant: " 'Hey, Delondre, I'm here to take you home.' " Defendant was

not handcuffed when Moody entered the conference room, and Moody did not cuff him or pat him down. They walked to an unmarked, white Chevy Impala, and defendant entered the back seat. There was no "cage"; the car had regular front seats and a regular back seat.[5] There was no conversation during the ride except for directions.

¶ 51        Moody testified that, the next day, at about lunch time, Rafferty and D'Oronzo asked him and Bernson to go back to defendant's house and pick up defendant so they could ask him some more questions. Only one car went to defendant's house, which was the car carrying Moody and Bernson. After Moody knocked on the door, a woman answered, and Moody asked for defendant by defendant's full name. It was Moody's practice to ask for people by their full name rather than by a nickname. The woman shut the door, and then defendant came to the door. Moody told defendant that the detectives who defendant spoke with yesterday wanted to speak to him again, and Moody asked defendant "if he minded coming back with us to the police station." Defendant replied "okay." The officers did not place any restraints on defendant; they did not pat him down; and they did not have their guns drawn. Once at the station, Moody asked defendant to wait in the foyer or entrance area. This area has a door to either enter the station or "go back outside." In the area were "warrant clerks" and "an administrative assistant." The area has a front desk where citizens can ask for information. After Moody and Bernson left defendant to speak with D'Oronzo and Rafferty, no one stayed with defendant. D'Oronzo and Rafferty instructed Moody to bring defendant to the conference room and turn on the television, which Moody did.

---

[5]On cross-examination, Moody added that there was also no glass separating the front from the back seat. It was just empty space. Moody also clarified that he used the same unmarked police car on both December 31 and January 1.

¶ 52        Moody testified that they did roll call in this conference room, so the room had a podium and a chalkboard, as well as the television. While defendant was in the roll-call room, he was not restrained in any way, and Moody was the only other person present. Moody turned on the Blackhawks game and explained to defendant why the hockey game was at Wrigley Field, since defendant seemed confused about that. There was no conversation about the case. During the afternoon, Moody was "in and out" of the room. Moody would come in, watch a bit of the game, talk to defendant about it, and then leave. When Moody was out of the room, defendant was not restrained in any way, and defendant was in there by himself. After a few hours, defendant asked when the officers were going to talk to him, and Moody asked D'Oronzo and Rafferty, and then Moody relayed to defendant that they had said that they would be there in a minute. When the other officers came to escort defendant out of the room, they did not handcuff him.

¶ 53        On cross-examination, Moody explained that, since he was a detective at that time, rather than on patrol, he did not have to pat down everyone he placed in his car and that he generally did not pat someone down unless the person was "a suspect or possible offender." After Moody asked defendant if he would mind coming back to the station, Moody did not ask defendant if defendant wanted to bring himself down to the station, because "he just walked out and followed us to the car." Defendant did not mention driving himself. Moody and Bernson were both dressed in plainclothes, with a badge and gun that readily identified them as police officers. The roll-call room had two doors: one that led directly into the foyer and one that led into the rest of the station. When defendant was waiting there, the door to the foyer was open, and the door to the rest of the station was closed. If defendant had asked to go, he could have left. If defendant had asked Moody, Moody would have told D'Oronzo and Rafferty

"hey, this guy is leaving. If you want to talk to him, talk to him now." Moody never said to defendant: "hey, do you want to go?"

¶ 54                                    5. The Trial Court's Ruling

¶ 55        On April 23, 2015, after listening to argument, the trial court denied defendant's motion. Prior to ruling, the court observed that, "contrary to what the defense argues, petitioner argues the defendant freely goes to the police station on the second time." The trial court found:

> "I believe that there is no Fourth Amendment violation despite what I ruled earlier
>
> at the motion for directed finding. There is no Fourth Amendment violation at any time.
>
> Defendant is not a suspect. They are treating him as a witness throughout this matter
>
> until he then gives his videotaped statement to Rafferty.
>
> So the motion is denied."

¶ 56                                             II. Trial

¶ 57        In this appeal, defendant does not contest the sufficiency of the evidence against him and does not challenge the admission of any exhibit or piece of evidence at trial other than his pretrial statement on January 1, 2009. Thus, we only summarize the trial evidence below.

¶ 58        In sum, the government's evidence at trial consisted primarily of statements by defendant and two eyewitnesses. Prior to trial, two eyewitnesses stated to the police and before a grand jury that they had observed defendant walk to the middle of the street and open fire at the victim's van as the van drove away. The pretrial statements of both witnesses were memorialized in writing and in their grand jury testimony. However, at trial, both witnesses recanted. Similarly, defendant confessed before trial to being the shooter and then recanted at trial.

¶ 59    An assistant medical examiner confirmed that the victim, who was the driver of the van, died from a gunshot wound to the head. A police investigator testified that he recovered 10, 9-millimeter spent cartridge cases at the scene, all fired from a semiautomatic weapon, and that one of the van's windows had been shot out. The State did not argue a motive for the shooting, and the victim's girlfriend, who was a passenger in the van, did not see who fired the shots.

¶ 60    III. Sentencing

¶ 61    One of the two issues that defendant raises on this appeal concerns the trial court's remarks at the sentencing hearing. Defendant argues that, at sentencing, the trial court considered a factor inherent in the offense, namely, the death of the victim.

¶ 62    At the sentencing hearing on July 2, 2019, the State presented in aggravation a statement from the victim's daughter and the testimony of the victim's sister, who testified that the 23-year-old victim was "a father, a son, a brother and a friend." In aggravation, the State argued that defendant lacked remorse, that the murder appeared to be unprovoked, and that defendant had tried to implicate someone else. The State argued defendant's "lack of remorse," and the defense objected. The trial court overruled the objection, stating "[i]t's argument." In mitigation, defense counsel argued that defendant was a good student,[6] came from a good family, had "no prior criminality," and had already served 11 years in jail.

¶ 63    The presentence investigation report (PSI) indicated that, at the time of his arrest, defendant had a 3.2 grade point average in school, was on the basketball team, had completed the eleventh grade, and was a senior in high school. At the time of the offense, he was just

---

[6]Defense counsel asserted that defendant graduated high school. However, the PSI does not state that defendant graduated but rather indicates that defendant's studies were interrupted by this case. The PSI states that defendant reported being a high school senior at the time of his arrest.

three months past his eighteenth birthday. For two years during high school, defendant had been employed at Subway, earing $400 per week, at $8.25 per hour, but he had to leave due to his basketball commitment. As such, the PSI indicated that the "source" of defendant's "employment status" and "income" was "Subway." Defendant had no gang involvement, fathered no children, and spent his free time playing basketball and attending church. Defendant had no juvenile adjudications of delinquency, and he received time served for one misdemeanor battery on February 11, 2018, which was years after this case. Although he reported drinking alcohol on the weekend at parties and a "casual use" of cannabis, he denied having a problem with either alcohol or drugs. Defendant reported a close relationship with both parents and his extended family and that his friends were a close-knit group on the basketball team. The PSI author noted that defendant was "very cooperative" and answered "all questions without hesitation."

¶ 64        During the hearing, defendant addressed the court and denied that he was the "killer." Defendant stated: "Everything is an assumption, because wasn't none of us present that night when this all happened." Defendant asked the court to consider that, similar to the victim's family, he had also been separated from loved ones:

> DEFENDANT: "The same way how they deal with their father, I have to deal with that with my father and my mother, too. Me not being able to see my mama, me not being able to talk to my brothers, me not being able to talk to my nieces, me not being able to talk to my nephew, that is that [*sic*] the same thing[.]"

¶ 65        After listening to defendant's remarks and arguments by the prosecutor and defense counsel, the trial court pronounced sentence. The parties agreed that the applicable sentencing

range was 35 to 75 years.[7] In his brief to this court, defendant argues that, in pronouncing a sentence "10 years above the minimum, the trial court found precisely one fact in aggravation: [defendant's] 'conduct caused serious harm' in that the victim's 'family lost a loved one.' " We present below the trial court's entire two pages of sentencing remarks, so that the trial court's comment about "a loved one" may be placed in context:

THE COURT: "Okay. First of all, it's not an assumption as to what happened. The jury found you guilty, and I think the jury did the right thing. I think the evidence against you was overwhelming, as far as I'm concerned.

What I find interesting here is how you turn yourself into the victim. You have been convicted of murder. You shot this young man senselessly, for no reason whatsoever that's ever been presented to me, but all of a sudden, you are the victim in this case, because you said you are gone from your family. They will never see their son again and their brother or their father, whatever the case may be. You can still have contact, albeit you will be in jail for a long period of time, but you can still see your family and talk to your family and write letters to your family. So don't turn yourself into the victim. That is the last thing you are is the victim.

As far as I'm concerned, you are a cold-blooded killer, and as I sit here on the bench for as many years as I have been sitting on the bench, these shootings, they make no sense whatsoever. Everybody is brave when they have an illegal gun, but face someone

---

[7]Normally, the sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-4.5-20(a) (West 2018). However, defendant was charged with committing the offense while armed with a firearm, which enhances the sentence by 15 years. 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2018) (15-year sentencing enhancement when "the person committed the offense while armed with a firearm").

face to face and go fight them? That's something different. It's the cowards that shoot them in the back and fire as the van is going by.

But to say that you are the victim is preposterous. They lost somebody they loved. They will never see him. All they have is memories. You still have your family[;] you can talk to and write to and say things to and write letters to. There's nothing more I can say, because it's so outrageous, it's so outrageous.

I had an opportunity to review the factors in aggravation and mitigation, review the presentence investigation, consider the arguments of the lawyers, and the defendant's conduct caused serious harm. [The victim's] family lost a loved one. And I read here in the presentence investigation you were raised by a loving family. It's not like you were thrown out on the street when you were 10 years old. You were raised by a loving family. You had all the advantages of the world. I see presentence investigations where people have not seen their parents where they were 15 and they are now 25 and they have no relationship. You had the relationship and you chose to just throw it all away and be the murderer that you are.

Considering factors in mitigation, the defendant had one prior conviction for a battery, so, as far as I'm concerned, he has no history of prior delinquency or criminality.

Based on that, the sentence of the Court will be 45 years [IDOC], 3 years mandatory supervised release."

¶ 66    On July 30, 2019, defendant filed a timely notice of appeal, and this appeal followed.

¶ 67                                    ANALYSIS

¶ 68                            I. Pretrial Statements

¶ 69                                    A. No Forfeiture

¶ 70        Defendant argues, first, that the trial court erred by failing to suppress the inculpatory

pretrial statement that he made on January 1, 2009. As a threshold matter, we observe that he

has preserved this issue for our review. To preserve an error for review on appeal, a party must

both (1) object at trial and (2) raise the issue again in a posttrial motion. *People v. Piatkowski*,

225 Ill. 2d 551, 564 (2007). This requirement "encourages a defendant to raise issues before

the trial court, thereby allowing the [trial] court to correct its [own] errors" and "consequently

precluding a defendant from obtaining a reversal through inaction." *Piatkowski*, 225 Ill. 2d at

564. When a criminal defendant has preserved an issue for our review, the burden is on the

State to show that the error, if there was one, was harmless beyond a reasonable doubt. *People*

*v. McLaurin*, 235 Ill. 2d 478, 495 (2009). An error is considered harmless if it appears beyond

a reasonable doubt that it did not contribute to the verdict. *People v. King*, 2020 IL 123926,

¶ 40. Thus, if we find that the trial court erred, the burden would switch to the State to show

that the error was harmless beyond a reasonable doubt.

¶ 71                                    B. Fourth Amendment

¶ 72        Defendant claims a violation of his constitutional right against unreasonable seizures.

¶ 73        Both the Illinois Constitution and the fourth amendment of the United States

Constitution protect citizens from unreasonable searches and seizures by police officers.

*People v. Holmes*, 2017 IL 120407, ¶ 25; U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6.

Article I, section 6, of the Illinois Constitution provides, in relevant part: "The people shall

have the right to be secure in their persons, houses, papers and other possessions against

unreasonable searches[ and] seizures ***." Ill. Const. 1970, art. I, § 6. Similarly, the fourth

amendment of the United States Constitution provides: "The right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ***." U.S. Const., amend. IV. Through the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) the federal protection of the fourth amendment applies to searches and seizures conducted by the states. *People v. Hill*, 2020 IL 124595, ¶ 19.

¶ 74 With respect to article I, section 6, of the Illinois Constitution, the Illinois Supreme Court has chosen to "follow decisions of the United States Supreme Court regarding searches and seizures." *Holmes*, 2017 IL 120407, ¶ 25. "[T]he 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials," such as police officers. *People v. Jones*, 215 Ill. 2d 261, 269 (2005); *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 55.

¶ 75 If a search or seizure occurs in violation of the fourth amendment, the fruits of that search or seizure may be suppressed. The purpose of the fourth amendment's exclusionary rule is to protect all of us by deterring fourth amendment violations by the police. *Terry v. Ohio*, 392 U.S. 1, 12 (1968) ("the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging" unreasonable seizures for all citizens); *People v. Flunder*, 2019 IL App (1st) 171635, ¶ 40 ("The fourth amendment is a blunt-edged sword, but it protects the privacy of us all, both the ones with contraband and the ones without it.").

¶ 76 C. *Prima Facie* Showing

¶ 77 On a motion to suppress, such as the one at issue here, the defendant bears the initial burden of coming forward with proof. *People v. Cregan*, 2014 IL 113600, ¶ 23. If the defendant makes a *prima facie* showing that the evidence or statement was obtained in an illegal search or seizure, the burden then shifts to the State to produce evidence to counter the defendant's

*prima facie* showing. *Id.* ¶ 23. "The ultimate burden of proof remains with the defendant, however." *Id.* ¶ 23.

¶ 78    In the case at bar, the trial court found that the burden had shifted to the State. Subsequent thereto, Moody's testimony established the voluntariness of the encounter, as we explain below.

¶ 79                              D. Standard of Review

¶ 80    The standard of review for a motion to suppress is well established. In *People v. Johnson*, 237 Ill. 2d 81, 93-94 (2010), as in our case, the defendant moved to suppress statements that he made at a police station following an alleged illegal arrest, and the supreme court explained the appropriate standard of review, as follows:

> "In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the [United States] Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 *** (1996). [Citation.] Under this standard, we give deference to the factual findings of the trial court, and we will reject those findings only if they are against the manifest weight of the evidence. [Citation.] However, a reviewing court ' '""remains free to undertake its own assessment of the facts in relation to the issues," ' " and we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Johnson*, 237 Ill. 2d at 88-89.

"Thus, we apply a bifurcated standard of review: (1) rejecting a trial court's factual findings only if they are against the manifest weight of the evidence (2) but reviewing *de novo* the trial court's conclusion as to whether those facts satisfy the legal standard to warrant suppression." *People v. Hernandez*, 2017 IL App (1st) 150575, ¶ 90 (citing *Johnson*, 237 Ill. 2d at 88-89).

¶ 81    "A factual finding is against the manifest weight of the evidence only if the finding appears to be unreasonable, arbitrary, or not based on the evidence or if the opposite conclusion is readily apparent." *Id.* ¶ 91. "*De novo* review means that we perform the same analysis a trial court would perform." *Id.* ¶ 92.

¶ 82    The case at bar required a credibility determination by the trial court, acting as the fact finder, at the suppression hearing. Defendant described the January 1 encounter as practically an invasion of 10 to 12 police vehicles and numerous officers. He claimed that he was handcuffed and watched by an officer at all times. By contrast, Moody testified that only one car with two officers arrived at defendant's home on January 1, that defendant was not handcuffed or even patted down, and that, while waiting at the station, defendant was frequently left alone in a room with an open door, leading to the outside. The trial court noted the difference in the factual claims and stated that he "believe[d]" there was no fourth amendment violation. This ruling indicates that the trial court resolved the credibility dispute in favor of the police.

¶ 83                                    E. Encounters

¶ 84    "Encounters between police officers and citizens have been divided by the courts into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, commonly referred to as '*Terry* stops,' which must be supported by a police officer's reasonable, articulable suspicion of criminal activity [citation]; and (3) consensual encounters that involve no coercion by the police and, thus, do not implicate the fourth amendment." *Bahena*, 2020 IL App (1st) 180197, ¶ 56; *Flunder*, 2019 IL App (1st) 171635, ¶ 25. The last category, which is at issue here, requires drawing a line between voluntary encounters, on the one hand, and fourth amendment seizures, on the other.

26

¶ 85 "[A] person has been seized when, considering the totality of the circumstances, a reasonable person would believe he was not free to leave." *People v. Oliver*, 236 Ill. 2d 448, 456 (2010). For a seizure to occur, the officer must have "in some manner restrained the citizen's liberty by physical force or show of authority." *People v. Williams*, 2016 IL App (1st) 132615, ¶ 36 (citing *People v. Luedemann*, 222 Ill. 2d 530, 550 (2006)). Distinguishing between a voluntary encounter and a seizure requires a court to analyze how an officer's conduct would objectively appear to a reasonable and innocent person. *Id.* ¶ 37. The "subjective perception" of either the subject or the officer involved is not the determining factor. *Id.*

¶ 86 "Our supreme court has identified different tests for determining whether a person is seized based upon" the different types of encounters. *Id.* ¶ 37. For example, "[w]here police approach a person sitting in a parked vehicle, the appropriate test is whether a reasonable innocent person would believe that he is ' "free to decline the officer's requests or otherwise terminate the encounter." ' " *Id.* ¶ 37 (quoting *Luedemann*, 222 Ill. 2d at 550-51, quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). "However, when the person is walking down the street, the appropriate test is whether a reasonable innocent person would feel free to leave ***." *Id.* ¶ 37.

¶ 87 As far as we know, there is no separate articulation of the test when the encounter involves a police station. Citizens enter police stations every day of the week, to ask or answer questions, to view lineups or photo arrays, and to receive or provide information. Not every encounter with a police officer inside a police station is a seizure. *People v. Gomez*, 2011 IL App (1st) 092185, ¶ 60 (the defendant was not under arrest, although he was waiting at a police station to speak to detectives). What makes this case so close to the line between voluntary

encounters and seizures is the fact that the police transported defendant to the station, rather than defendant voluntarily proceeding there on his own, and the fact that he remained there for several hours. *Id.* ¶ 59 (the length of the encounter and whether the defendant was transported in a police car are factors a court may consider). Our supreme court has found:

"Generally, the following *Mendenhall* factors indicate a seizure without the person attempting to leave: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; or (4) using language or tone of voice compelling the individual to comply with the officer's requests." *People v. Almond*, 2015 IL 113817, ¶ 57 (citing *Oliver*, 236 Ill. 2d at 456, citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980))).

Based on these factors and the unique facts of the case that we list below, we find that this encounter falls on the voluntary side of the line.

¶ 88    First, Officer Moody testified that he asked defendant if defendant "minded" coming to the station again, and defendant agreed. Even defendant in his testimony admitted that the officers had asked, and he had agreed to go.[8] *Id.* ¶ 58 (there was "no evidence that either officer used language or a tone of voice compelling defendant to comply"). Second, Moody testified that defendant was not handcuffed or even patted down, before entering the back seat of the officers' car. D'Oronzo testified that, the day before, on December 31, defendant had been patted down before entering the police vehicle. However, Moody did not pat defendant down on January 1. This action would communicate to a reasonable innocent person that he was not being regarded with suspicion. *Id.* ¶ 58 ("[t]he officers did not physically touch defendant"). Third, Moody testified that only one police vehicle arrived at defendant's home. *Id.* ¶ 60 ("the

---

[8]Defendant testified that he had replied: "Okay, I go with you."

police officers' arrival in [one] marked car, standing alone, is insufficient to create [a] threatening presence"). Fourth, this vehicle, which defendant rode in, had no cage. It was a regular vehicle, with a regular back seat and regular front seats. *Gomez*, 2011 IL App (1st) 092185,¶ 60 ("Defendant was not handcuffed or otherwise restrained and accompanied the detectives in an unmarked police car without a cage."). Fifth, only two officers were involved in the encounter at defendant's home and, immediately after arriving at defendant's home around lunchtime, they knocked on the front door and used defendant's proper name, as would any other normal visitor. No guns were drawn; the officers did not arrive in the middle of the night; and Moody was dressed in a shirt and tie, with a badge that communicated his office. Defendant corroborated that the officers who came to the door were in plainclothes.[9] *Almond*, 2015 IL 113817, ¶ 58 (the two "officers wore plain clothes, and neither displayed a weapon"); *Gomez*, 2011 IL App (1st) 092185, ¶ 60 (the arrival of officers at 5 a.m. at a private home is "suggest[ive]" of an arrest). Sixth, after arriving at the station, Moody asked defendant to wait in a foyer, where citizens could walk in and out and speak to someone at the front desk. When Moody and Bernson left defendant to find another officer, no officer stayed behind in the foyer to watch defendant. Nothing physically stopped defendant from walking out the door to the street. *Almond*, 2015 IL 113817, ¶ 60 (after the officers' arrival, nothing stopped defendant and others from moving about the store). Seventh, after Moody escorted defendant to the conference or roll-call room, Moody turned on the Blackhawks game and talked about the game. Moody testified that defendant was not asked any questions about the case and was not handcuffed. During his testimony, defendant corroborated that, while in the roll-call room with

---

[9]D'Oronzo, testified that, on January 1, 2009, Moody was dressed in "a shirt and tie." Moody testified that, in addition to the shirt and tie, he also wore a badge and gun on his belt.

Moody, defendant was not asked any questions about the case and Moody watched the Blackhawks game.

¶ 89     Eighth, Moody testified that, during the afternoon of January 1, he was in and out of the roll-call room where defendant waited. When Moody was out of the room, defendant was by himself and was not restrained in any way. *Gomez*, 2011 IL App (1st) 092185, ¶ 60 (The defendant was left alone and "was not handcuffed at the station and was kept in a room with the door open."). Ninth, Moody testified that one of the doors of the roll-call room opened directly to the foyer and that this door was open. Again, nothing physically stopped defendant from walking out the door, through the foyer, to the street, and then heading home. Tenth, defendant waited a few hours before the interview with D'Oronzo began, but it was in the early afternoon. Moody testified that he had picked up defendant around lunch time, and the videotaped interview began at 3:49 p.m. But see *id.* ¶ 61 ("Defendant was only at the police station for approximately one hour" prior to his arrest.). Eleventh, D'Oronzo testified that, when he approached defendant in the roll-call room on January 1, defendant was watching television and D'Oronzo told defendant that he had some things that he wanted to clarify with defendant. D'Oronzo testified that, during the interview that began at 3:49 p.m., defendant eventually admitted to being the shooter and that the officers were surprised when they realized they had a confession rather than some clarification.

¶ 90     This is a close case. In *Williams*, 2016 IL App (1st) 132615, for example, this court found that an officer's demand to "come here" was enough to transform a street encounter into a fourth amendment seizure. *Id.* ¶¶ 6, 11, 41. The State points to defendant's release the day before as evidence that defendant was free to go. However, the issue is not whether the police thought he was, or was not, a suspect. The question is whether a reasonable person in

defendant's shoes would have thought he was free to go. If we considered just the circumstances of the detention on December 31, a reasonable person in defendant's shoes may have believed that he was not free to go until he was told he could go. However, a consideration of all the facts and circumstances on January 1 leads us to a different conclusion.

¶ 91 In sum, we find that the facts listed (*supra* ¶¶ 87-88) above show that this encounter falls on the voluntariness side of the line. The release on December 31 would communicate to a reasonable innocent person that he was not under arrest at that time. On the morning of January 1, when the officers returned, they asked, rather than demanded, that defendant come to the station for further questioning. They did not frisk or pat him down, they did not handcuff or restrain him in any way, and, for multiple stretches of time, they left him by himself, near an open door with direct access to the street, without anything or anyone to prevent him from leaving. After all, he had been released the day prior. Thus, the trial court did not err in denying defendant's pretrial motion to suppress.

¶ 92                                    II. Sentencing Error

¶ 93 Defendant claims that the trial court erred at sentencing by relying on an improper factor: that a family lost a loved one, which was inherent in the offense.

¶ 94                                    A. Standard of Review

¶ 95 Choosing the appropriate sentence within a prescribed sentencing range is normally within a trial court's discretion. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. On review, appellate courts treat the trial court's choice with great deference and presume that the trial court based its decision on proper legal reasons. *Id.* ¶ 8. This presumption that the trial court relied on proper reasons is overcome only by an affirmative showing of evidence to the

31

contrary. *Id.* The defendant bears the burden of proof and persuasion in showing that the sentence was based on improper considerations. *Id.* ¶ 9.

¶ 96      "Although sentencing is normally within the trial court's discretion, whether the court relied on an improper aggravating factor is a question of law, which we review *de novo*." *People v. Matute*, 2020 IL App (2d) 170786, ¶ 53; see *People v. Phelps*, 211 Ill. 2d 1, 11-12 (2004); *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. In the case at bar, both sides agree that this is the appropriate standard of review for this issue. Although a trial court has broad discretion when imposing a sentence within the prescribed range, it may not consider a factor inherent in the offense as an aggravating factor at sentencing. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9; see *People v. Rissley*, 165 Ill. 2d 364, 390 (1995) ("a factor implicit in the offense for which [the] defendant is convicted cannot be used as an aggravating factor at sentencing"). A single fact or factor may not be used both as an element of the offense and as a basis for imposing a harsher sentence. *Phelps*, 211 Ill. 2d at 11-12; *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. Such a dual use of a single fact or factor is considered a " 'double enhancement,' " because the legislature must have already considered this fact or factor when determining the applicable sentencing range for the offense. *Phelps*, 211 Ill. 2d at 11-12; *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9. Thus, for example, in defendant's case, where he was convicted of murder and received an additional firearm enhancement, the fact that the offense involved either the death of a person or a firearm cannot be considered as an aggravating factor. See, *e.g.*, *People v. Saldivar*, 113 Ill. 2d 256, 272 (1986) (the death of the victim is a factor implicit in the offense of voluntary manslaughter and, thus, cannot be considered as a factor in aggravation).

¶ 97                                B. Forfeiture

32

¶ 98        The State argues that defendant's sentencing claim is forfeited, and defendant agrees. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). In the case at bar, defendant did neither. However, we may still review the alleged error pursuant to the plain error doctrine. *People v. Sebby*, 2017 IL 119445, ¶ 48. Under the plain error doctrine, we may provide relief if the error was clear or obvious and if one of the two following prongs is satisfied: either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) the error is so serious that it affected the fairness of the proceeding and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Sebby*, 2017 IL 119445, ¶ 48. In the case at bar, defendant argues for plain error under both prongs of the plain error doctrine. However, "[t]he initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error" in the lower court proceeding. *Id.* ¶ 49.

¶ 99        For the reasons explained below, we find that the error alleged by defendant was clear and obvious.

¶ 100                             C. Clear and Obvious Error

¶ 101        Defendant argues that, in imposing a sentence 10 years above the statutory minimum, the trial court found "precisely one fact in aggravation: [defendant's] 'conduct caused serious harm' in that the victim's 'family lost a loved one.' " While we disagree that this was the only factor considered in aggravation, it was nonetheless a factor and, as such, was improper.

¶ 102        The trial court's two pages of sentencing remarks are quoted in full above and show that the trial court found more than "one fact."

¶ 103    In addition to the factors discussed above, the trial court did consider, as defendant argues, that the offense involved a death, which is an impermissible factor to consider since it is already a factor inherent in the offense of murder. Initially, in the first four paragraphs of his sentencing remarks, the trial judge clearly reacted to the defendant's immediately prior statement at sentencing. In these first few paragraphs of its sentencing remarks, the court commented on (1) defendant's lack of remorse; (2) the fact that defendant came from "a loving family" and, thus, did not suffer from the disadvantages and hardships afflicting numerous other defendants who had appeared before the trial court; (3) the manner of death, namely, that he shot the victim in the back as the victim's van was driving by; and (4) the alleged senselessness of the murder. The court observed that the victim's family "will never see their son again and their brother or their father." The court emphasized: "They lost somebody they loved. They will never see him. All they have is memories." The court did not indicate however whether the aforementioned statements were intended to be aggravating factors.

¶ 104    After providing four paragraphs of said introductory remarks, the trial court returned to the typical format of a sentencing, stating: "I had an opportunity to review the factors in aggravation and mitigation, review the presentence investigation, consider the arguments of the lawyers, and the defendant's conduct caused serious harm." The court then specifically listed factors in aggravation. We know that these were factors in aggravation because, after he finished stating them, the trial court immediately switched to "[c]onsidering factors in mitigation."

¶ 105    The factors in aggravation that the trial court listed at this point in the sentencing were (1) the victim family's loss of "a loved one" and (2) the advantages defendant had from growing up with a loving family. After mentioning these two facts, the trial court turned to

34

factors in mitigation, where the trial court found that, as far as it was "concerned," defendant had "no history of prior delinquency or criminality." Weighing these factors in aggravation and mitigation, the trial court picked a sentence in the lower half of the applicable range.

¶ 106    In sum, our reading of the trial judge's sentencing remarks shows that he mentioned the fact of death, first, when setting forth the aggravating factors that he had found and that he also referred to this fact repeatedly throughout his introductory remarks: (1) "They will never see their son again and their brother or their father"; (2) "They lost somebody they loved. They will never see him. All they have is memories"; and (3) the victim's "family lost a loved one."

¶ 107    To determine whether this shows a clear and obvious error, we discuss the following cases cited by the parties: *Saldivar*, 113 Ill. 2d 256; *People v. Kelley*, 2019 IL App (4th) 160598; *People v. Sanders*, 2016 IL App (3d) 130511; and *People v. Benford*, 349 Ill. App. 3d 721 (2004).

¶ 108    In *Saldivar*, the supreme court determined, first, that the forfeiture rule should not apply, despite the defendant's failure both to object after the sentence was pronounced and to file a postsentencing motion. *Saldivar*, 113 Ill. 2d at 266. The court found that forfeiture should not apply under the unique circumstances of the case where, prior to the pronouncement of sentence, the prosecutor had stressed that the defendant had killed the victim and the defense counsel replied that, " '[b]y definition,' " manslaughter involves a death. *Id.* at 266. The trial court apparently ignored defense counsel's argument when it then went on to find that the death was the primary aggravating factor. *Id.* at 266. Our supreme court found: "it was not necessary for counsel to interrupt the judge and point out that he was considering wrong factors in aggravation, especially in light of the argument that had preceded the ruling." *Id.* at 266. By

contrast, in the case at bar, there is no dispute that the issue is forfeited for our review and, thus, defendant must establish plain error to obtain relief.

¶ 109    After finding no forfeiture, the *Saldivar* court proceeded to consider the requirement in the Illinois Constitution that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *Saldivar*, 113 Ill. 2d at 268. From this constitutional directive is derived the statutory requirement to consider, as an aggravating factor, whether defendant's conduct caused serious harm. 730 ILCS 5/5-5-3.2(a)(1) (West 2018) (the following factor "may be considered by the court as [a] reason[ ] to impose a more severe sentence *** (1) the defendant's conduct caused or threatened serious harm"). Balancing, on the one hand, the constitutional and statutory directives to consider the seriousness of the offense and the degree of harm with, on the other hand, the principle that one cannot consider a fact inherent in the offense as an aggravating factor, our supreme court found: "it is permissible for the trial court, in applying the statutory aggravating factor that the defendant's conduct caused serious harm to the victim, to consider the force employed and the physical manner in which the victim's death was brought about." *Saldivar*, 113 Ill. 2d at 271. However, the supreme court drew a line between considering, on the one hand, the force employed and the physical manner of the death and, on the other hand, focusing "primarily on the end result of the defendant's conduct, *i.e.*, the death of the victim, a factor *** implicit in the offense." *Saldivar*, 113 Ill. 2d at 271-72.

¶ 110    Applying the principles of *Saldivar* to the case before us, we find that the trial court's repeated comments about the loss of a loved one showed a focus on the end result of defendant's conduct, *i.e.*, the death of the victim, which is an impermissible factor under

36

*Saldivar*. We find that this was a clear and obvious error, although it was not preserved as it was in *Saldivar*, because it was repeated and listed as the first and, hence, primary aggravating factor. Similarly, in *Saldivar*, the trial court found the death to be the primary aggravating factor and repeated the fact of the death in its remarks. *Id.* at 264 (the trial court mentioned that defendant's conduct caused death and that a human life was taken). In *Saldivar*, the trial judge mentioned other factors, but the reviewing court still found error where the fact of death was listed by the sentencing judge as the first or primary aggravating factor. *Id.* at 264, 271. The same is true in the case at bar. Thus, applying the binding principles of our supreme court's *Saldivar* opinion, we find a clear and obvious error.

¶ 111    In addition to the binding supreme court case of *Saldivar*, we also consider more recent cases from our fellow districts and divisions, as cited by the State, such as *Kelley*, 2019 IL App (4th) 160598, *Sanders*, 2016 IL App (3d) 130511, and *Benford*, 349 Ill. App. 3d 721.

¶ 112    In *Kelley*, the murder victim's bones and skull were found apart from each other near a dried-up tributary of a river. *Kelley*, 2019 IL App (4th) 160598, ¶¶ 11-12. An anthropologist testified that she found 29 straight-line incisions on the victim's bones, "as if someone had attempted to dismember her with a knife." *Id.* ¶ 15. Although the anthropologist was unable to determine how the victim died, she found that the cuts were inflicted "around the time of death." *Id.* At sentencing, the trial court found: " 'The knowledge that the family has as to the circumstances of her death and how her remains were treated is something that they'll have to bear as well, and that exceeds what would be inherent in the definition of murder itself.' " *Id.* ¶ 72. On appeal, the defendant argued that the trial court had improperly considered the pain caused to the victim's family as an aggravating factor, because it is implicit in the offense of murder. *Id.* ¶ 116. The appellate court found:

"The death of the victim and serious harm to the victim are implicit in—that is, are always to be found in—the offense of murder. By contrast, the grief of surviving family members, though a common result of murder, is not implicit in murder itself. The murder victim might have no family, or the family might be indifferent. A deleterious effect on the murder victim's family is a frequent consequence of murder, not something inherent in murder itself." *Id.* ¶ 117.

¶ 113    The appellate court did not cite or consider *Saldivar*. If it had, it would have seen that "the force employed and the physical manner in which the victim's death was brought about" (*Saldivar*, 113 Ill. 2d at 271) are factors that a sentencing court may consider, separate and apart from the death itself—and that was what the lower court in the *Kelley* case expressly found (*Kelley*, 2019 IL App (4th) 160598, ¶ 72). Thus, we understand the *dicta*, quoted above, in the *Kelley* case to be limited to the particular and horrifying facts of this murder, where someone, around the time of the murder, attempted to dismember the victim with a knife. *Kelley*, 2019 IL App (4th) 160598, ¶ 15. In terms of its ultimate finding, the *Kelley* case is completely in line with *Saldivar*.

¶ 114    In *Sanders*, the murder victim was shot several times in the back. *Sanders*, 2016 IL App (3d) 130511, ¶ 4. The defendant was found guilty both of murder and of personally discharging the firearm that proximately caused the death. *Id.* ¶ 5. At sentencing, the trial court stated: " '[a]mong other things, the defendant's conduct did cause or threaten serious harm. It may be inherent in the actual fact that he committed a murder, but it did occur.' " *Id.* ¶ 6. On appeal, defendant acknowledged that he had forfeited the issue by failing to object in the court below but sought review under the second prong of the plain error doctrine. *Id.* ¶ 11. The appellate court observed that, while resentencing is not necessary where the record is clear that

the trial court gave only insignificant weight on the improper factor, "[t]he cause must be remanded for resentencing where a reviewing court is unable to determine the weight given to an improper factor." *Id.* ¶ 13 (citing *People v. Beals*, 162 Ill. 2d 497, 509 (1994)). The appellate court noted that, in the case before it, "the trial court expressly stated, in aggravation, that the defendant's conduct did cause harm." *Id.* ¶ 14. Reversing the sentence and remanding for resentencing, the appellate court found:

> "Specifically, the trial court's express finding that the defendant's conduct caused or threatened serious harm, a factor inherent in the offense of first degree murder, impinged on the defendant's right not to be sentenced based on an improper factor and affected his fundamental right to liberty." *Id.* ¶ 17.

¶ 115     The *Sanders* case is similar to our case in many respects and supports our finding. Like in our case, the offense was first degree murder, with a shooting in the back. Like in our case, the defendant forfeited the issue and sought plain error review, thereby requiring a showing of clear and obvious error to obtain relief. Like in our case, the trial court made a finding while considering the factors in aggravation. Per the principles discussed in *Sanders*, if we cannot determine from the cold record the weight placed on this factor, then a remand is necessary. *Id.* ¶ 13. Thus, *Sanders* supports our finding of clear and obvious error.

¶ 116     In *Benford*, 349 Ill. App. 3d at 723, the 21-year-old defendant was convicted of first degree murder for the street shooting of a fellow gang member and sentenced to 40 years in prison, which was 20 years over the minimum. At sentencing, the trial court stated that " 'the minimum sentence here would really deprecate the seriousness of the offense as well as the fact that you killed a man. You armed yourself with a handgun, walked onto the streets of Chicago and shot a man dead.' " *Id.* at 734. On appeal, the State argued, first, that the defendant

had forfeited the issue for review by failing to raise it below. *Id.* at 734. However, the appellate court observed that waiver was a limitation on the parties but not on a court's right to consider an argument. *Id.* at 734. Citing *Saldivar* and stating that it had conducted "a thorough review of the totality of the circuit court's comments at the sentencing hearing," it found that the trial court's quoted comments were merely an acknowledgement of the seriousness of the offense and not an indication that it had considered the murder as an aggravating factor. *Id.* at 735.

¶ 117    *Benford* does share some similarities with the case at bar. Like our case, the young defendant in *Benford* shot someone on the streets of Chicago and received a sizeable number of years over the minimum. Like our case, the *Benford* defendant forfeited the issue for review. Like we do, the *Benford* court applied *Saldivar* to the facts before it. However, *Benford* carries little precedential weight since we, unlike the *Benford* reviewing court, are not privy to "the totality of the circuit court's comments" at sentencing and, thus, lack a basis for comparison. *Benford*, 349 Ill. App. 3d at 735.

¶ 118    Based on our consideration of *Saldivar*, *Kelley*, *Sanders*, and *Benford*, we find clear and obvious error.

¶ 119                              D. Closely Balanced

¶ 120    Having found a clear and obvious error, we turn next to the question of whether the evidence at the sentencing hearing was closely balanced. After first establishing a clear and obvious error, a defendant who alleges a forfeited sentencing error must then show that "the evidence at the sentencing hearing was closely balanced," in order to obtain relief under the first prong of the plain error doctrine. *Hillier*, 237 Ill. 2d at 545. There are several issues of particular concern to this court.

¶ 121    In the case at bar, except for the offense itself and defendant's protest of innocence, there was hardly a negative fact in the whole PSI or at the sentencing proceeding. As we noted above in the Background section, the PSI indicated that, at the time of his arrest, defendant, a high school senior, had a 3.2 grade point average and was on the basketball team. At the time of the offense, he was just three months past his eighteenth birthday. For two years during high school, he worked at Subway, as verified by Subway, until he had to leave due to basketball. Defendant had no gang involvement, no children, no juvenile adjudications, no drug or alcohol abuse, and no convictions other than one misdemeanor on February 11, 2018, almost a decade after this case. He had a close relationship with his family and his close-knit group of friends on the basketball team. Even the PSI author noted how "very cooperative" defendant was.

¶ 122    The trial judge's remarks at sentencing suggest that he was angered by defendant's assertion of innocence,[10] by the fact that defendant had a loving family, and by the lack of motive evidence. The State contends on appeal that the trial court found "defendant's lack of remorse" and defendant's "loving family" to be aggravating factors. The State argues that the trial court "found that the fact that defendant chose to engage in criminal activity despite having had the advantage of being raised by a loving family *was an aggravating factor*."

¶ 123    First, lack of remorse is a double-edged sword, and secondly a teenager's loving family is simply not an aggravating factor. On the one hand, a defendant who later asserts his

---

[10]In sentencing defendant to 10 years above the statutory minimum, the trial court's pronouncement—whether intentional or coincidental—resulted in a greater sentence than the State's plea offer and a *de facto* 10-year penalty for going to trial. Prior to trial, on April 9, 2018, the trial court reviewed a plea offer with defendant, where the court noted several times that the "minimum" defendant was facing was 45 years, while the State was offering him 35 years, or 10 years less. Defense counsel interjected to emphasize that 45 was the minimum only if defendant was convicted of the more serious charge of personally discharging a firearm. At trial, this more serious charge was not presented to the jury. Thus, defendant received 10 more years on the less serious charge. However, the plea bargain has no effect on our finding of plain error.

innocence in a postconviction petition may be lauded where he has consistently protested his innocence. Yet at sentencing, a defendant may be penalized for showing a lack of alleged responsibility or remorse. *People v. Ward*, 113 Ill. 2d 516, 527-28 (1986); *People v. Cross*, 2021 IL App (4th) 190114, ¶ 144. But see *People v. Donlow*, 2020 IL App (4th) 170374, ¶ 84 (a trial court cannot impose a more severe sentence simply because a defendant refuses to abandon a claim of innocence).

¶ 124          In support of its argument that a loving family can be an aggravating factor, the State cites *People v. Thurmond*, 317 Ill. App. 3d 1133, 1143 (2000), and *People v. Tatum*, 181 Ill. App. 3d 821 (1989). However, those cases are inapposite. Neither case—*Thurmond* nor *Tatum*—stands for the proposition that a loving family is a factor to be held against a youthful defendant. Neither *Thurmond* nor *Tatum* involved a youthful, 18-year-old offender, as in the case at bar. *Thurmond* involved a foster dad who sexually assaulted his 12-year-old foster child and niece, and *Tatum* involved a well-off defendant who nonetheless chose to sell drugs. *Thurmond*, 317 Ill. App. 3d at 1136; *Tatum*, 181 Ill. App. 3d at 826. A teenager lacks the maturity to appreciate the benefits of a loving family, whereas the adults in *Thurmond* and *Tatum* were certainly old enough to know better.

¶ 125          Lastly, the State's decision not to offer a motive cannot be held against defendant.[11] The State is under no burden to prove a motive. However, its decision not to argue a motive cannot be held against the defendant either. Yet that seems to be what happened in this case at

---

[11]On appeal, the State argues that the trial court "recognized that defendant" acted "without provocation or purpose" and that defendant had "no reason."

sentencing. The trial court stated: "You shot this young man senselessly, for no reason whatsoever that's ever been presented to me[.]"[12]

¶ 126    For the foregoing reasons, we find that the evidence at sentencing was closely balanced and, thus, constitute error under the first prong of the plain error doctrine. We proceed next to consider the appropriate remedy.

¶ 127                                III. Rule 615(b) Discretion

¶ 128    As a final matter, defendant asked this court to exercise the discretion given to it by Illinois Supreme Court Rule 615(b) to reduce his 45-year sentence to the 35-year statutory minimum. Illinois Supreme Court Rule 615(b)(4) provides that, on appeal, a reviewing court may "reduce the punishment imposed by the trial court."

¶ 129    Normally, a trial court's sentencing decision within a permitted sentencing range is entitled to great deference, and a reviewing court will not reverse the exercise of that discretion unless an abuse has occurred. *People v. Jackson*, 375 Ill. App. 3d 796, 800-01 (2007). A reviewing court may not reverse simply because it would have weighed the factors differently than the trial court did. *Id.* Although the authority to reduce punishment under Rule 615(b)(4) should be exercised sparingly, we choose to exercise it here. In the case at bar, we have already found plain error, and the question is merely one of remedy.

¶ 130    In light of defendant's complete lack of prior criminality, delinquency, gang involvement, or drug issues, the already-existing 15-year statutory enhancement due to use of a firearm, the State's indication that 35 years was an appropriate sentence when an even more

---

[12]On appeal, both parties acknowledge that, at sentencing, the trial court characterized the murder as senseless. The parties argue about whether the trial court's remark was or was not a specific finding of an aggravating factor. This is an argument without a difference. What matters is the impact of this characterization on sentencing.

serious charge was on the table, and the fact that defendant was only three months past his eighteenth birthday and still a high school student, we exercise our discretion under Rule 615(b) to reduce defendant's sentence by 10 years to the statutory minimum of 35 years.

¶ 131                                    CONCLUSION

¶ 132        For the foregoing reasons, we affirm defendant's conviction, but we reduce his sentence to the statutory minimum of 35 years.

¶ 133        Affirmed as modified.

¶ 134        JUSTICE TAILOR, concurring in part and dissenting: in part

¶ 135        I agree with the majority that, although close, the circuit court's decision to deny Townsend's motion to suppress his pretrial inculpatory statement of January 1, 2009, was not error. However, I dissent from the majority's decision to reduce Townsend's sentence to 35 years' imprisonment under Illinois Supreme Court Rule 615(b) because I do not believe that the circuit court relied on the victim's death—a factor inherent in the offense of murder—to aggravate his sentence.

¶ 136        In reducing his sentence, the majority accepts and relies on Townsend's contention that the circuit court found "[Townsend's] 'conduct cause[d] serious harm' in that the victim's family lost a loved one." (Internal quotation marks omitted.) *Supra* ¶ 101. The circuit court's actual words were: "defendant's [(Townsend's)] conduct caused serious harm. Brandon's [(the victim)] family lost a loved one." Section 5-5-3.2 of the Unified Code of Corrections (Code) provides that a sentencing court may consider certain factors as reasons to impose a more severe sentence, including whether "the defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2018). However, a factor implicit in the offense cannot be used by the sentencing judge in aggravation to justify a more severe sentence than might

44

otherwise be imposed. *People v. Saldivar*, 113 Ill. 2d 256, 266-67 (1986) (citing *People v. Conover*, 84 Ill. 2d 400, 404 (1981)). Of course, serious harm is inherent in the offense of murder. *Id.* at 271.

¶ 137      However, the record in this case does not establish that the circuit court used the fact of the victim's death to aggravate Townsend's sentence. First, the circuit court did not say "Townsend's 'conduct caused serious harm' in that the victim's 'family lost a loved one,' " nor do I believe that the court intended to make this finding. Second, the circuit court never used the term "death" and never referenced "the victim" or the "death of the victim." Third, the record does not support Townsend's contention or the majority's finding that, when the circuit court remarked "Brandon's family lost a loved one," it was referring to the victim's death as the serious harm caused by Townsend.

¶ 138      To the contrary, the more logical and reasonable inference to be drawn from the statement that Brandon's family lost a loved one is that the circuit court was acknowledging the family's victim impact statements expressing their sadness and profound loss, especially at the thought of the victim missing the important milestones in his daughter's life, and rebuking Townsend's statement in allocution where he failed to take responsibility for his actions and attempted to cast himself as the victim of the justice system because, among other things, he would be separated from his loved ones. In response to Townsend's statement at sentencing, the court stated, "What I find interesting here is how you turn yourself into the victim. You have been convicted of murder. You shot this young man senselessly, for no reason whatsoever that's ever been presented to me, but all of a sudden, you are the victim in this case, because you said you are gone from your family." The court went on to say, "[the victim's family] will never see their son again and their brother or their father, whatever the case may

be. You can still have contact, albeit you will be in jail for a long period of time, but you can still see your family and talk to your family and write letters to your family. So don't turn yourself into the victim." The court further chastised Townsend, "But to say that you are the victim is preposterous. They lost somebody they loved. They will never see him. All they have is memories. You still have your family you can talk to and write to and say things to and write letters to."

¶ 139     Section 5-5-3.2 allows a court to consider the serious harm caused to people other than the victim. In *People v. Brown*, 2019 IL App (5th) 160329, ¶ 22, it was held not to be error when the court stated at sentencing, " 'The statutory factors in aggravation, I find that the defendant threatened harm and caused harm by his actions,' " where the evidence and argument before the court was that the defendant's actions threatened serious harm to innocent bystanders and caused serious harm to the victim's mother and his four children. The court stated, "Section 5-5-3.2(a)(1) does not state that the serious harm to be considered is restricted to the serious harm to the victim, and we decline to judicially recraft the plain language of the section." *Id.*

¶ 140     The court's consideration of the serious harm caused to a victim's family in a murder case may also be properly considered as a factor in aggravation under section 5-5-3.2, as serious harm to the victim's family is not considered a factor inherent in the offense of murder. *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 117 ("By contrast, the grief of surviving family members, though a common result of murder, is not implicit in murder itself. The murder victim might have no family, or the family might be indifferent. A deleterious effect on the murder victim's family is a frequent consequence of murder, *not something inherent in murder itself*." (Emphasis added.)). I do not agree with the majority's conclusion that this statement in

*Kelley* is *dicta* (*supra* ¶ 113), nor do I agree that its application is limited to the particular and horrifying facts of the murder and dismemberment of the victim's body in that case. The majority does not explain why it believes *Kelley*'s finding is *dicta*, nor does it articulate any reason (and I see none) to limit *Kelley* to the particularly horrifying conduct at issue in that case. Although in *Brown*, the defendant shot the victim in the head and chest, causing his death, *Brown* did not involve the kind of gruesome conduct to which the majority claims *Kelley*'s application is limited.

¶ 141    Moreover, as the majority recognizes, *Saldivar* teaches that, while the fact of the victim's death may not be used to aggravate a sentence, the force and physical manner used to cause the death may. Thus, even if the majority's construction of the circuit court's comments is reasonable, it was not error for circuit court to state at sentencing that Townsend's conduct caused serious harm "in that" the victim's family lost a loved one.

> "While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted*." (Emphases in original.) *Saldivar*, 113 Ill. 2d at 269.

"[I]n applying the statutory aggravating factor that the defendant's conduct caused serious harm to the victim, [the court may] consider the force employed and the physical manner in which the victim's death was brought about." *Id.* at 271. On the other hand, it is improper to aggravate a sentence based on the end result of the defendant's conduct, the victim's death. *Id.* at 272.

¶ 142    Here, the trial court did not expressly consider that "defendant's conduct caused serious harm" or "Brandon's family lost a loved one" as factors in aggravation, much less label them as " '[t]he number one factor in aggravation' " (*id.*) or as a factor that it "must consider" (*People v. Willis*, 210 Ill. App. 3d 379, 388 (1991)), comments found to be impermissible. Rather, reading the entire exchange between Townsend and the circuit court at sentencing, a more reasonable construction of the court's comments was that it considered as an aggravating factor the serious harm caused by "the force employed and the physical manner in which the victim's death was brought about." *Saldivar*, 113 Ill. 2d at 271. To provide context for the circuit's court statement, the Cook County assistant medical examiner testified, without contradiction, that the cause of the victim's death was a gunshot wound to the right side of his head and that a projectile was removed from the victim's head. When discussing the offense, the circuit court remarked,

> "As far as I'm concerned, you are a cold-blooded killer, and as I sit here on the bench for as many years as I have been sitting on the bench, these shootings, they make no sense whatsoever. Everybody is brave when they have an illegal gun, but face someone face to face and go fight them? That's something different. It's the cowards that shoot them in the back and fire as the van is going by."

¶ 143    The court found that Townsend killed the victim in cold blood when Townsend shot the victim in a moving van with an illegal firearm. Contrary to the majority's finding, such comments are permissible under *Saldivar* because they focus on the force and physical manner of the victim's death, not on the fact of the victim's death. Indeed, in one of the cases cited with approval, and followed, by *Saldivar*, *People v. Hughes*, 109 Ill. App. 3d 352 (1982), our supreme court explained that the appellate court in that case placed considerable weight on the

fact that the trial court noted that the defendant carried a gun, took deliberate aim at the victim, and fired two shots. The appellate court reasoned that these considerations lent support to the trial court's conclusion that the defendant intentionally caused or threatened serious harm to the victim. *Saldivar*, 113 Ill. 2d at 271.

¶ 144    In addition, even if I were to accept the majority's reading of the circuit court's comments at sentencing, I still would not find error because the comments about the consequences of Townsend's actions were general in nature and made in passing. Courts recognize that no thoughtful sentencing hearing for a defendant convicted of murder can avoid mention of the victim's death. In *People v. Brewer*, 2013 IL App (1st) 072821, the court stated, " 'Factors in aggravation, the defendant's conduct did cause or threaten serious harm, the ultimate serious harm, murder.' " *Id.* ¶ 56. We found no abuse of discretion where the defendant's sentence was well within the statutory range for first degree murder, holding:

> "The record does not indicate the trial court emphasized a factor inherent in the offense during sentencing. Contrary to [defendant's] assertions, the fact his conduct threatened or caused serious harm is not a factor inherent in the crime itself but is a proper aggravating factor to be considered during sentencing even in cases where serious bodily harm is implicit in the offense." *Id.* ¶ 57 (citing *Saldivar*, 113 Ill. 2d at 269, *People v. Solano*, 221 Ill. App. 3d 272, 274 (1991), and *People v. Spencer*, 229 Ill. App. 3d 1098, 1102 (1992)).

¶ 145    Similarly, in *People v. Beals*, 162 Ill. 2d 497 (1994), during sentencing, the court stated: "In aggravation the first guideline indicated in the statute is 'whether the conduct of the defendant caused or threatened serious harm.' Well, we all know that your conduct caused the ultimate harm. It caused the loss of a human life." (Internal quotation marks omitted.) *Id.* at

508-09. Our supreme court held that the trial court never considered the victim's death as an aggravating factor; rather, "the record suggests that the trial court statement was simply a general passing comment based upon the consequences of the defendant's actions." *Id.* at 509. The *Beals* court further noted that even if "the trial court's comment may be construed in the manner that the defendant suggests," it would still affirm his sentence because the record indicated that the trial court had placed little weight on the fact that his conduct caused the victim's death and had instead relied on other aggravating factors including the victim's age, the fact that the offense was drug related, the need to punish and deter him, and the need to protect society. *Id.* As such, the court rejected the defendant's argument that the case should be remanded for resentencing. *Id.*

¶ 146     Like the comments made by the courts in *Brewer* and *Beals*, the circuit court's comments that Townsend caused serious harm and Brandon's family lost a loved one were isolated, passing comments made about the consequences of Townsend's actions. The record establishes that the circuit court was focused on the loss that the victim's family suffered rather than on the victim's death itself.

¶ 147     A sentence imposed by the trial court that falls within the prescribed statutory range is considered presumptively proper and will not be disturbed unless it is greatly at variance with the purpose and spirit of the law or is manifestly disproportionate to the offense. *People v. Cabrera*, 116 Ill. 2d 474, 493-94 (1987). In this case, Townsend was convicted of first degree murder with a firearm, which has a sentencing range of 35 to 75 years. 730 ILCS 5/5-4.5-20(a) (2018). Townsend was sentenced to 45 years' incarceration, 10 years above the mandatory minimum sentence and 30 years below the maximum sentence, and accordingly his sentence is presumptively proper. See *People v. Hauschild*, 226 Ill. 2d 63, 90 (2007) (a sentence within

statutory guidelines is presumptively valid). The circuit court, in my view, did not consider any improper factor to undermine this presumption.

¶ 148  For the foregoing reasons, I find that no error occurred at sentencing and therefore plain error analysis is unnecessary. I would therefore affirm the judgment of the circuit court.

*People v. Townsend*, **2022 IL App (1st) 200911**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 09-CR-02019; the Hon. Brian Flaherty, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Gavin J. Dow, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Joseph Alexander, and Gerrard R. Burch Jr., Assistant State's Attorneys, of counsel), for the People. |