2023 IL App (1st) 221584-U

FOURTH DIVISION
Order filed June 22, 2023

No. 1-22-1584

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN RE K.O., a minor | ) | Appeal from the |
| | ) | Circuit Court of Cook |
| (The People of the State of Illinois, | ) | County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19 JD 1630 |
| | ) | |
| K.O., | ) | Honorable |
| | ) | Cynthia Ramirez, |
| Respondent-Appellant.) | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1 *Held*: We affirmed the circuit court's finding of delinquency holding that: (1) the circuit court's error in questioning prospective jurors regarding the Supreme Court Rule 431(b) factors did not rise to the level of plain error; (2) the circuit court did not err in admitting a statement made by the victim to a paramedic: (3) the State did not fail to prove the respondent guilty beyond a reasonable doubt; and (4) the circuit court did not consider an improper sentencing factor.

¶ 2    The respondent, K.O., appeals from the judgment of the circuit court finding him delinquent based on a jury finding of guilty of first degree murder and committing him to the Department of Juvenile Justice until the age of 21 and imposing and staying an adult sentence of 30 years. On appeal, the respondent contends the circuit court committed plain error when it failed to ask the jurors whether they "understood and accepted" the principles identified in Supreme Court Rule 431(b) (eff July 1, 2012); the circuit court erred when it permitted the State to question a paramedic regarding a statement made by the victim; the State failed to prove him delinquent beyond a reasonable doubt; and the circuit court erred when it used his silence as evidence that he lacked remorse during sentencing. For the reasons that follow, we affirm.

¶ 3    The State filed a petition for adjudication of wardship, which alleged the respondent was delinquent for, *inter alia*¸ shooting and killing Jordan Webb. Prior to trial, the State moved to admit evidence of statements made by Webb shortly after he was shot. The State alleged that Webb was shot on October 9, 2019, while on the first floor of a house in Altgeld Gardens and, after he was shot, went upstairs and stated to Shatanya Bates that he had been shot. When Bates asked "who?" he replied "Kodak," using a nickname for the respondent. The State further alleged that while en route to a hospital in the back of an ambulance, Webb asked, "Am I going to die?" He went into cardiac arrest in the ambulance and died shortly thereafter at a hospital despite the efforts of emergency medical technicians and hospital staff. The State argued that the statement "Kodak" should be admitted as an excited utterance or dying declaration. Following a hearing the circuit court held that the statement was admissible as an excited utterance "and or" a dying declaration.

¶ 4    Later the respondent moved, *in limine*, to exclude evidence of the statement made by Webb in the ambulance arguing that its probative value was substantially outweighed by the danger of

unfair prejudice. The State responded, arguing that the statement was part of the proper foundation for the admission of Webb's statement as a dying declaration. The circuit court overruled the objection.

¶ 5    The circuit court began jury selection on June 21, 2022. The circuit court questioned the prospective jurors about the four factors listed in Rule 431(b). However, rather than asking whether the jurors accepted and understood the principles, it variously asked whether they were "capable of complying with this rule?"; "disagreed with this rule?" or "agreed with this rule?" The respondent did not object to the questioning.

¶ 6    Following jury selection and opening statements, the circuit court received evidence. Kimberley Jackson, Webb's mother, testified that her son was alive on October 9, 2019, and identified a photograph of him after he died.

¶ 7    Shawn Miller, Jr. testified that he was born in January 2003. Miller admitted that in 2020, he was arrested and charged with possession of a firearm. He pled guilty and received one year of court supervision, which was terminated satisfactorily. He also admitted that he was arrested twice for "drugs" in 2020 and 2021. Those cases were dismissed, and no promises were made by the State in regard to those cases for his testimony in this case. Miller admitted that he was appearing pursuant to a subpoena and that he was currently facing a contempt of court charge for failing to appear to testify at an earlier court date. He testified that no promises were made by the State regarding the contempt of court charge.

¶ 8    On October 9, 2019, Miller was living in Altgeld Gardens in a two-story house. The lower floor consisted of a front room and a kitchen, and there were bedrooms upstairs. He shared the house with his mother and siblings. When he woke up that day, his sister Shatanya and brother C.J. were

in the house. His friend Devon was also in the house. Webb and Kodak came over. The respondent was identified in open court as Kodak. Some additional friends, whose names Miller could not remember, joined them for a total of seven individuals in the living room. His sister and brother remained upstairs.

¶ 9    Miller further testified that the respondent was armed with a small revolver. He showed the revolver to everyone and then placed it in his waistband. The respondent asked Webb if he could use his telephone. Webb said "No" and they began to "tussle." Webb and the respondent were grabbing each other by the shirt, and Webb "swung" the respondent onto the couch. No one threw a punch or kick and neither party appeared hurt. The respondent got off the couch and went into the kitchen. Webb remained in the front room sitting on the couch. Two people left, but the respondent, Devon, and Webb remained. The respondent came out of the kitchen and told Webb he was "going to pop him." He then shot Webb in the chest and ran out of the house.

¶ 10    Miller and Webb went up the stairs and used Miller's sister's phone to call the police. They went back downstairs and waited for the police to arrive. Webb was sitting on the couch when the police and fire department arrived. Miller saw him loaded into an ambulance. Miller spoke to the police but did not tell them what happened. Miller's father came home and went with him to the police station. Miller picked the respondent out of a photo array as the individual who shot Webb.

¶ 11    Miller further testified that he did not tell the police what happened when they first arrived, because he didn't want anyone to get in trouble. He changed his mind because his father told him to tell the truth.

¶ 12    On cross-examination. Miller admitted that he initially told police that he was playing video games in his bedroom with headphones on and did not hear the shooting.

¶ 13    Shatanya Bates testified that she lived in Altgeld Gardens on October 9, 2019. Shatanya admitted that she was testifying pursuant to a subpoena and had a pending contempt proceeding as a result of not appearing earlier. On October 9, 2019, she was upstairs sleeping in her bedroom with her two-year-old brother. She was woken by "loud talking" from downstairs. She went downstairs and saw her brother Miler and six other boys. She asked them to be quiet and returned upstairs. Two minutes later she heard a gunshot. She got up and saw Miller and Webb coming up the stairs. Her brother, Miller, said, "he shot him" and when asked "Who?" Webb replied "Kodak." Shatanya gave her brother her phone and he called 911. She admitted that she later gave statements to a police officer, a detective, and an assistant State's Attorney.

¶ 14    The State called Nicholas Wadolny, a firefighter paramedic, as a witness. Outside the presence of the jury, the respondent objected, arguing that Webb's statement "Am I going to die?" was more prejudicial than probative. The circuit court overruled the objection. Wadolny testified that he treated Webb on October 9, 2019. Webb was critically injured. Webb asked, "Am I going to die?" On the way to the hospital, Webb stopped breathing and his heart stopped. Wadolny and his partner treated Webb, but he was not breathing and had no pulse when they arrived at the hospital.

¶ 15    Dr. Libby Aronson, M.D., a pathologist, with the Cook County medical examiner's office testified that she reviewed an autopsy protocol, photographs, and x-rays of Webb. She opined that the cause of death was a gunshot wound to the chest and that the manner of death was homicide.

¶ 16    The State rested and the respondent moved for a directed verdict. The circuit court denied the motion, and the respondent rested without presenting evidence.

¶ 17    Following closing arguments, the jury was instructed and began deliberations. The jury found the respondent guilty of first degree murder. The circuit court ordered, among other things, an adult sentencing report and continued the matter for sentencing.

¶ 18    A report prepared by a probation officer and submitted to the circuit court contains the following statement by the probation officer:

"[The respondent] stated that on October 9, 2019, he was with K-Money (16) and they went to Shawn Miller's house who was an associate of theirs. [The respondent] added that Shawn lived in the Altgeld Gardens Complex, but he did not know the address. He added that Lil C (16) and Lil Moe (16) arrived at the house a few minutes later. As note[d] [the respondent] disclosed that other than Shawn he did not know the boys' real names. He also stated that none of these boys were gang affiliated or involved. After approximately 30 minutes of smoking marijuana and playing video games K-Money began to argue with another boy at the house, Jordan Webb (17) [The respondent] stated that Lil C 'jumped in' to help K-Money and 'things stopped for about a minute.' It was then that Lil C shot Jordan Webb 'once' and left the house with Lil Moe. [The respondent] then ran out of the house with K-Money as Shawn ran upstairs towards the bedrooms.

[The respondent] stated that he and K-Money then went to the store to buy some candy and afterwards went home. [The respondent] added that he never disclosed what had happened to this mother and 'had no idea' what they did with the gun. After CPD officers came to this house looking for him, he and his mother went to the 5th district on 10/11/2019. He was arrested on 10/11/2019 for first degree murder.

With regards to the arrest, [the respondent] stated that 'Shawn tricked' on him and that he was the only one arrested. With regards to his testifying at trial [the respondent] stated there was 'no reason to.' "

¶ 19    On October 18, 2022, the circuit court conducted a sentencing hearing. During sentencing the circuit court stated the following:

"While the Court understands that the minor continues to persist in his innocence, the Court nonetheless is cognizant of the fact that the minor has not displayed any remorse, accountability, or responsibility for his actions regarding the death of Jordan Webb."

The circuit court sentenced the respondent to confinement in the Illinois Department of Juvenile Justice until the age of 21 with an adult sentence of 30 years' incarceration which was stayed as long as the respondent complied with the juvenile sentence. This appeal follows.

¶ 20    Before addressing the issues raised in this appeal, we find need to comment on the reason for the delay in issuing our decision. This case involves a delinquent minor and is subject to the expedited appeals provisions of Illinois Supreme Court Rule 660A (eff. July 1, 2018). The notice of appeal was filed on October 18, 2022. Our decision in this matter was due 150 days later on March 1, 2023, pursuant to Rule 660A(f) (eff. July 1, 2018). On January 31, 2023, the record was filed, making the appellant's brief due 28 days later on February 28, 2023. Ill. S. Ct. R. 660A(d) (eff. July 1, 2018). On February 27, 2023, the State Appellate Defender (SAD), representing the respondent-appellant, filed a motion for an extension of time to file the appellant's brief, asserting an incomplete record as the reason. On February 28, 2023, this court granted the motion and ordered the brief to be filed by March 28, 2023. That extension was marked final. On March 23, 2023, the SAD filed a motion seeking a second extension to file the respondent's brief, again asserting the absence of a

complete record as the reason. On March 23, 2023, this court granted the motion and ordered the brief to be filed by April 25, 2023. That extension was again marked final. This court granted several motions to file supplements to the record. On March 27, 2023, the last of the supplements to the record was filed. No brief was filed by the SAD on behalf of the respondent when due on April 25, 2023. On May 1, 2023, the SAD filed a motion to file the respondent's brief instanter, asserting that additional time was required to complete a "thorough review" of the complete record before a brief could be filed. This court granted the motion on that same day. Thereafter, the State timely filed its brief on May 24, 2003, and a reply brief was filed on June 6, 2023.

¶ 21    We remind counsel that requests for extensions of time in appeals involving delinquent minors "are disfavored and shall be granted only for compelling reasons."  Ill. S. Ct. R. 660A(g) (eff. July 1, 2018). If counsel for an appellant in an appeal involving a delinquent minor encounters difficulty in securing a complete record, application for immediate assistance in expediting the preparation of the record should be made to the trial court pursuant to the provisions of Rule 660A(b)(eff July 1, 2018).

¶ 22    On appeal, the respondent contends: (1) the circuit court erred when it failed to ask the juror whether they "understood and accepted" the principles identified in Rule 431(b); (2) the circuit court abused its discretion when it permitted Wadolny to testify that Webb asked "Am I going to die?" because the evidence was irrelevant and merely served to appeal to the jury's sympathy for Webb; (3) the State failed to prove him guilty beyond a reasonable doubt; and (4) the circuit court erred when, during sentencing, it considered his silence as evidence that he lacked remorse and accountability for his actions. For the reasons that follow we affirm.

¶ 23    Because our analysis of the respondent's procedural challenges may involve consideration of the strength of the evidence against him, we will consider his sufficiency challenge first. The State must prove the elements of the substantive offense alleged in a delinquency petition beyond a reasonable doubt. *In re W.C.*, 167 Ill. 2d 307, 336 (1995) (citing *In re Winship*, 397 U.S. 358 (1970)). The relevant inquiry on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71 (citing *Jackson v. Virginia¸*443 U.S. 307, 318-19 (1979)). We must carefully examine the evidence without failing to consider that it was the jury who observed and heard the witnesses. *Id.*, ¶72 (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). "Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside." *Id.* (citing *People v. Hall*, 194 Ill. 2d 305, 330 (2000)).

¶ 24    The testimony of a single witness, if positive and credible, is sufficient to sustain a conviction. *People v. Harris*, 2018 IL 121932, ¶ 27. Where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether the jury could reasonably accept the testimony as true beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 36. "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.* (citing *People v. Siguenza-Brito¸*235 Ill. 2d 213, 228 (2009)).

¶ 25    The respondent in this case was charged with first degree murder. The petition alleged, *inter alia*, that he violated section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/ 9-1(a)(1) (West 2018)) when he "without lawful justification[,] intentionally or knowingly shot and killed Jordan Webb while armed with a firearm, thereby causing the death of Jordan Webb."

¶ 26    Here, there is ample evidence of the respondent's guilt. Miller unequivocally testified that the respondent shot Webb in the chest a few moments after they argued about a phone and tussled on the couch. The respondent was known to Miller, and the respondent does not argue that Miller was not in a position to observe the shooting or that there was any impediment to his ability to identify him. Moreover, Miller's testimony was corroborated by Webb's statement that "Kodak" shot him. If the jury found this testimony credible, it was sufficient to establish the respondent's guilt.

¶ 27    The respondent, however, argues that the testimony was not credible. The respondent notes that Miller previously told police officers that he was playing video games with headphones on and neither heard nor saw the shooting.  "It is the province of the trier of fact to determine the effect of a prior inconsistent statement upon the credibility of a witness, since an inconsistent extra judicial statement does not, *per se,* destroy the probative value of that witness' testimony; the trier of fact may accept the credibility of the witness notwithstanding the impeaching inconsistent statement." *People v. Young*, 133 Ill. App. 3d 886, 892 (1985). Here, there is nothing inherently incredible about the testimony of a teenaged boy that he was reluctant to speak with police about a shooting that occurred in his own house until urged by his father to tell the truth. More importantly, it was the obligation of the jury, not this court, to determine whether to accept Miller's trial testimony or his prior inconsistent statement as true. See *Id.* Therefore, we cannot conclude that the State failed to prove the respondent guilty of murder merely because Miller was less than forthcoming when initially confronted by police.

¶ 28    The respondent also argues that "[a]lthough many were present for the shooting, no one corroborated Miller's account." However, the State was under no obligation to locate and present

every potential witness. See *People v. Deskin*, 60 Ill. App. 3d 476, 480 (1978) ("[T]he failure of the State to call all occurrence witnesses does not raise an inference that those witnesses who were not called would be helpful to the defendant where one eyewitness does testify directly to the event and his testimony is clear and convincing.") Miller's testimony regarding the shooting was clear and unequivocal and sufficient to establish the respondent's guilt. Therefore, we find no reason to presume that the testimony of the other young men present at the shooting would have favored the respondent. Moreover, we cannot conclude that the failure to present their testimony creates reasonable doubt regarding the respondent's guilt.

¶ 29    The respondent next contends that the trial court's failure to comply with Rule 431(b) constituted plain error. Illinois Supreme Court Rule 431(b) requires a court to question potential jurors regarding four principles of criminal law, commonly referred to as the *Zehr* principles. See, *e.g.*, *People v. Meuller*, 2015 IL App (5th) 130013, ¶ 23; see also *People v. Zehr*, 103 Ill 2d 472, 477 (1984). We review compliance with Supreme Court Rules *de novo*. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010).

¶ 30    The first step in the plain-error analysis is to determine whether there was a clear or obvious error at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49 Here, the parties agree that it was clear error for the circuit court to ask the prospective jurors whether they agreed or disagreed with the Rule 431(b) principles. See *People v. McGuire*, 2017 Il. App (4th) 150695, ¶ 31. The parties also agree that the respondent failed to preserve the error for review by objecting to the error at trial and raising the error in a posttrial motion. See *Sebby*, 2017 IL 119445, ¶ 48.

¶ 31    The second step of the plain-error analysis depends on the respondent's argument. *Id.* ¶ 50. A respondent may argue either that (1) the evidence was so closely balanced that the error alone

severely threatened to tip the scales of justice, or (2) the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *Id.* ¶¶ 50-51. Here, the respondent is alleging that the evidence was closely balanced. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.*, ¶ 53 (citing *People v. Belknap*, 2014 IL 117094, ¶¶ 52-53)

¶ 32    The respondent argues that the evidence was closely balanced for the same reasons he challenged the sufficiency of the evidence: Miler admitted to initially telling police that he did not see or hear the shooting; none of the other young men corroborated Miller's account; and there was no physical evidence tying him to the shooting. We disagree for the same reasons we rejected the respondent's sufficiency of the evidence arguments. Miller's testimony at trial clearly and unequivocally identified the respondent as the individual who shot Webb. Furthermore, the jury heard evidence that Webb similarly identified the respondent by his nickname "Kodak." Therefore, we conclude the evidence was not closely balanced, and reject the respondent's plain-error argument. See *People v. Curry*, 2013 IL App (4th) 120724, ¶¶ 69-70 (holding that there was no plain-error when the trial court erred by asking potential jurors whether they agreed or disagreed with the *Zehr* principles but the evidence was not closely balanced).

¶ 33    Next, respondent argues that the circuit court abused its discretion and committed reversible error when it admitted evidence that Webb asked Wadolny "Am I going to die?" The State, apparently conceding that admission of the statement was in error, argues the error was harmless. We are not, however, bound by a party's concession and may affirm on any basis contained in the

record. See *People v. Horrell*, 235 Ill. 2d 235, 241 (2009). Accordingly, we will begin with an examination of whether it was error to admit the statement.

¶ 34    Before trial, the State argued, *in limine*, that Webb's statement that "Kodak" shot him should be admitted as a dying declaration. The common law exception to the hearsay rule known as a "dying declaration" has been codified in the Illinois Rules of Evidence as Rule 804(b)(2), which provides an exception to the hearsay rule for a statement by an unavailable declarant to allow:

> "In a prosecution for homicide, a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." Ill. R. Evid. 804(b)(2) (eff. Jan 1, 2011).

To admit a statement as a dying declaration, the proponent must show: (1) the statement relates to the cause or circumstances of the underlying homicide; (2) the declarant believe death is impending and almost certain to immediately follow; and (3) declarant is mentally capable of giving an accurate statement regarding the cause or circumstances of the homicide. *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 57. The initial question whether a statement as admissible is a dying declaration is a matter for the court, but the question of the weight to be given a statement is a matter for the jury. See *People v. Broughton*, 35 Ill. App. 3d 619, 624 (1976).

¶ 35    Here, we find, as the circuit court did, that the disputed statement, "Am I dying?" was relevant to whether Webb believed he was dying. Accordingly, this statement was part of the circumstances surrounding the dying declaration, and the jury could hear it in order to fully evaluate the weight that the dying declaration should be given. Therefore, we conclude that there was no error in the admission of this evidence.

¶ 36    Finally, the respondent contends that the circuit court erred during sentencing when it considered his silence against him, stating that he "has not displayed any remorse, accountability, or responsibility." The respondent argues that in doing so the circuit court violated section 5-4.5-105(a)(9) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a)(9) (West 2020)). We disagree.

¶ 37    The respondent acknowledges that he failed to preserve this error, but urges us to consider it as plain error. The first step in the plain-error analysis is to determine whether any error occurred. See *People v. Short*, 2020 IL App (1st) 162168, ¶ 66.

¶ 38    The circuit court granted the State's motion to designate this case as an Extended Jurisdiction Juvenile prosecution pursuant to section 5-810 of the Juvenile Court Act of 1987 (705 ILCS 405/5-810 (West 2018)). Accordingly, the circuit court was required to impose an adult criminal sentence under section 5-4.5-105 of the Code of Corrections, which would be stayed on the condition that the respondent not violate the provisions of the juvenile sentence. See 705 ILCS 405/5-810(b)(4)(ii) (West 2018). Section 4-4.5-105 of the Code of Corrections provides a list of factors that must be considered in mitigation when sentencing an individual under the age of 18. See 730 ILCS 5/5-4.5-105(a) (West 2020). Included in that list is subsection (a)(9) which requires the court to consider:

>   "any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a)(9) (West 2020).

We review *de novo* the issue of whether a circuit court considered an improper aggravating factor during sentencing. See *People v. Townsend*, 2022 IL App (1st) 200911, ¶ 96.

¶ 39     We cannot conclude that the circuit court improperly considered the respondent's silence as an aggravating factor. First, the circuit court clearly prefaced its remarks about the respondent's lack of remorse with a recognition of his right to maintain his innocence, indicating that it was not improperly holding the respondent's silence against him. Second, and more importantly, the respondent had not elected to remain silent, instead giving a statement to the probation officer who was preparing an adult sentencing report. That statement contained no expression of remorse for the shooting. The circuit court could properly rely on the respondent's statement which alleged that someone else was the shooter and that Miller "tricked" on him as evidence that the respondent was a liar who had not accepted responsibility for his actions. See *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 29.

¶ 40     In *Charleston*¸ the defendant gave a statement in allocution where he said he was "truly sorry" for the victim's family, but told the trial court "I'll have another chance to prove my innocence." *Id.*, ¶ 10. The trial court found that the defendant had asked for mercy but had not expressed remorse. *Id.*, ¶ 12. The reviewing court held: "The trial court was at liberty to express its belief that defendant was guilty, and it was free to consider defendant's protestation of innocence and lack of remorse as indicative of his character and prospects for rehabilitation." *Id.*, ¶ 29 (citing *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 36.

¶ 41     Here, the circuit court merely noted that the respondent had not expressed remorse. This was a reasonable conclusion to draw from his statements that Miller "tricked" on him and Lil C shot Webb. The circuit court could properly consider the strength of the evidence against the respondent and his protestations of innocence to conclude that he had not taken responsibility for his actions. See *Charleston*, 2018 IL App (1st) 161323, ¶ 29. Therefore, we conclude that the circuit court did

not consider an improper aggravating factor when it imposed a 30-year adult sentence on the respondent. Because there was no error there can be no plain error.

¶ 42    For the foregoing reasons we affirm the judgment of the circuit court.

¶ 43    Affirmed.